ROBERT RHODES *v.* CITY OF HARTFORD ET AL.
(12831)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued June 3—decision released August 12, 1986

*Wesley W. Horton,* with whom were *Cynthia A. Blair* and, on the brief, *Stephen B. Goddard* and *Julé A. Crawford,* for the appellant (plaintiff).

*Steven M. Sellers,* deputy assistant state's attorney, with whom were *Saundra Kee* and, on the brief, *John M. Bailey,* state's attorney, for the appellees (defendants).

PETERS, C. J. The sole issue on this appeal is a determination of the scope of General Statutes §§ 21-44 and 21-45, which regulate the business practices of pawnbrokers. In the face of possible criminal prosecution, the plaintiff Robert D. Rhodes, a licensed pawnbroker,[1] sought a declaratory judgment to determine whether General Statutes §§ 21-44 and 21-45 apply to financing arrangements known as repurchase transactions. After a hearing, the trial court ruled that repurchase transactions do fall within the ambit of the two statutes. The plaintiff appeals from this judgment.

The underlying facts are not in dispute. In conducting a repurchase transaction, the plaintiff purchases an item from a customer at 60 percent of its fair market value and gives the customer an option to repurchase the item at a stipulated price and within a

---

[1] The plaintiff has temporarily ceased operating the pawnshop pending the court's decision in this case.

stipulated period of time, which is not less than fifteen days nor more than two months.[2] He determines the repurchase price by adding 20 percent of the fair market value (which is 33⅓ percent of the purchase price) each month to the purchase price. Upon delivering the item to the plaintiff, the customer signs and retains a copy of a document entitled "Repurchase Agreement," which he must present to the plaintiff in order to repurchase the item. On those occasions on which the plaintiff lends money on a traditional pledge of pawned property, he lends the customer only half of the amount that would be available under a repurchase. Virtually all of the terms and conditions of these pawnbroking transactions are determined by the plaintiff.

General Statutes § 21-44[3] prescribes the maximum interest rates that pawnbrokers may charge on money they lend. General Statutes § 21-45[4] sets the minimum length of time that pawnbrokers must retain pledged personalty before it can be sold to the general public.

---

[2] The plaintiff testified at trial that he assesses the fair market value of an item based upon his three and one-half years experience in the pawnbroking business.

[3] "[General Statutes] Sec. 21-44. RATES OF INTEREST. No pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, directly or indirectly, for the use of money loaned on personal property, any more than the following rates: For the use of money amounting to fifteen dollars or less, five per cent per month or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per cent per month or fraction thereof; for the use of money exceeding fifty dollars in amount, two per cent per month or fraction thereof."

[4] "[General Statutes] Sec. 21-45. PLEDGES TO BE KEPT SIX MONTHS. No such lender shall sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid. All such property shall be sold or disposed of, at public or private sale, only after advertisement in a daily newspaper published in the town in which such lender carries on business, at least once two days before the date of the sale or sales, which advertisement shall state the numbers of the pledge tickets representing the property offered for sale, and the date or dates when such tickets were issued."

At trial, the plaintiff claimed that these provisions, which by their express language regulate loans, do not apply to his repurchase transactions because repurchase transactions are not loans. The trial court rejected the plaintiff's contention. Labeling the repurchase transaction a subterfuge for a loan, and positing that "[o]ne should not be able to avoid a tax on shoes by calling shoes slippers," the trial court held that General Statutes §§ 21-44 and 21-45 do apply to repurchase transactions. The plaintiff renews his claim on appeal. We find no error.

Before reaching the merits of this case, we must, as a preliminary matter, decide whether the trial court had subject matter jurisdiction to entertain this action for declaratory relief even though the plaintiff is not presently engaging in repurchase transactions. A declaratory judgment action is a special proceeding under General Statutes § 52-29 that is implemented by §§ 389 and 390 of the Practice Book. *Kiszkiel* v. *Gwiazda,* 174 Conn. 176, 180, 383 A.2d 1348 (1978). Section 390 (b) of the Practice Book conditions declaratory relief upon the existence of "an actual bona fide and substantial question or issue in dispute . . . which requires settlement between the parties." The need for settlement of the dispute must be viewed in light of the particular circumstances of each case. *Kiszkiel* v. *Gwiazda,* supra, 181. In this case, the plaintiff's complaint alleged, and the state admits, that the state had manifested its intention to prosecute him for violation of §§ 21-44 and 21-45.[5] Because the plaintiff has been restricted in pursuing his livelihood, his dispute with the state raises a substantial question suitable for

[5] The state had in fact initiated a criminal prosecution against the defendant and had consented to dismissal of these charges only upon the plaintiff's representation that he would temporarily cease engaging in repurchase transactions and would pursue a declaratory judgment to determine the applicable scope of §§ 21-44 and 21-45.

declaratory adjudication. Accordingly, we conclude that the trial court had jurisdiction to adjudicate this action.

Turning to the merits, we review the trial court's construction of §§ 21-44 and 21-45 in light of well established principles that require us to ascertain and give effect to the apparent intent of the legislature. *Norwich* v. *Silverberg*, 200 Conn. 367, 370–71, 511 A.2d 336 (1986); *State* v. *Kozlowski*, 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith*, 194 Conn. 52, 57, 480 A.2d 425 (1984); *State* v. *Delafose*, 185 Conn. 517, 521, 441 A.2d 158 (1981); 2A Sutherland, Statutory Construction (4th Ed. 1984) § 45.05. When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance because we assume that the words themselves express the intention of the legislature. *Johnson* v. *Manson*, 196 Conn. 309, 316, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986); *Mazur* v. *Blum*, 184 Conn. 116, 118–19, 441 A.2d 65 (1981). When we are confronted, however, with ambiguity in a statute, we seek to ascertain the actual intent by looking to the words of the statute itself; *State* v. *Kozlowski*, supra, 673; *Dukes* v. *Durante*, 192 Conn. 207, 214, 471 A.2d 1368 (1984); the legislative history and circumstances surrounding the enactment of the statute; *State* v. *Kozlowski*, supra, 673; *DeFonce Construction Corporation* v. *State*, 198 Conn. 185, 187, 501 A.2d 745 (1985); *State* v. *Parmalee*, 197 Conn. 158, 161, 496 A.2d 186 (1985); *State* v. *Delafose*, supra, 522; and the purpose the statute is to serve. *Peck* v. *Jacquemin*, 196 Conn. 53, 64, 491 A.2d 1043 (1985); *Verrastro* v. *Sivertsen*, 188 Conn. 213, 221, 448 A.2d 1344 (1982); *Robinson* v. *Unemployment Security Board of Review*, 181 Conn. 1, 8, 434 A.2d 293 (1980).

Examination of the language of §§ 21-44 and 21-45 reveals that neither statute plainly defines the pawnbroking activity to which it applies. Section 21-44 pro-

vides, in relevant part, that "[n]o pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, directly or indirectly, for the use of money loaned on personal property, any more" than the interest rates prescribed therein. Section 21-45, apparently referring to the same class of pawnbroking transactions alluded to in § 21-44, provides that "[n]o such lender shall sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid . . . . " In determining the applicability of these two sections, the central issue before us is, therefore, whether a pawnbroker who engages in a repurchase transaction is, for purposes of § 21-44, a pawnbroker who takes or receives, directly or indirectly, interest in return for the use of money he loans on the pledge of personal property.

The plaintiff claims that, because §§ 21-44 and 21-45 are penal in nature, we should construe their provisions strictly and resolve any ambiguity in his favor. We disagree. The plaintiff is correct in his assertion that the pawnbroking statutes have a penal component, as his own incipient prosecution for their violation demonstrates. See General Statutes § 21-47.[6] We note, however, that although penal statutes are to be construed

---

[6] "[General Statutes] Sec. 21-47. PENALTIES. Any person, corporation or partnership which engages in the business of a pawnbroker, or in any business described in section 21-39, unless licensed according to law, or after notice that its license has been revoked, or which violates any of the provisions of this chapter or neglects to keep a book in the English language or to make the entries therein as provided by law or refuses to allow the same to be inspected by the proper officers or receives an article of personal property by way of pawn or pledge from any minor, knowing or having reason to believe him to be a minor, shall be fined not more than fifty dollars for the first offense and not more than one hundred dollars for the second offense, and, for the third offense, shall be fined not more than five hundred dollars or imprisoned not more than six months or both, and also shall forfeit treble the amount loaned on the property so pledged to any person injured thereby who sues therefor."

strictly; *Nowak* v. *Nowak,* 175 Conn. 112, 125, 394 A.2d 716 (1978); see *State* v. *Cataudella,* 159 Conn. 544, 555, 271 A.2d 99 (1970); *Hallenbeck* v. *Getz,* 63 Conn. 385, 387, 28 A. 519 (1893); we need not adopt the narrowest technical meaning of a criminal statute so as to disregard the context in which it exists and to frustrate its obvious legislative intent. *State* v. *Kozlowski,* supra; *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983). Moreover, the facts of this case do not warrant special deference to the rule of strict construction. The plaintiff no longer faces criminal charges. He brought this declaratory judgment action to test the scope of criminal liability created by §§ 21-44 and 21-45 and to determine whether he may lawfully resume his customary business practices. Since the plaintiff runs no immediate risk of criminal exposure, his case does not present as compelling a case for a rule of strict construction as it would if it arose in the context of a prosecution of a criminal defendant. Finally, the rule of strict construction must be balanced against the competing interest of effectuating the public policy of the pawnbroking laws as remedial statutes. See *Borzencki* v. *Estate of Stakum,* 195 Conn. 368, 383, 489 A.2d 341 (1985); *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 520, 461 A.2d 938 (1983); *State* v. *Hurlburt,* 82 Conn. 232, 236, 72 A. 1079 (1909).

The plaintiff urges us to hold that a pawnbroker's involvement in a repurchase transaction does not constitute the taking or receiving, directly or indirectly, of interest in return for the use of money he loans on the pledge of personal property. In support of his argument, he claims that the language of § 21-44 limits its application to loans. Because a repurchase transaction takes the form of a sale with an option to repurchase rather than the form of a loan, he contends that repurchase transactions are beyond the scope of §§ 21-44 and 21-45. This reasoning, however, fails to take into

account the fact that the statute expressly governs loans given in return for indirect, as well as direct, interest payments. By extending the statutes' coverage to transactions involving the indirect payment of interest, the legislature indicated that it intended the statutes to regulate not only those transactions that take the classic form of a conventional pawnbroking loan, but also financing arrangements that, in substance if not in form, amount to the economic equivalents of such a loan. Accordingly, the statutes apply to any transaction, regardless of its label or form, in which a pawnbroker gives a customer money and, in return, receives the right to hold the customer's property and the right to demand payment from the customer for the use of the money before allowing the customer to reclaim his property.

A comparison of repurchase transactions with conventional pawnbroking loans illustrates that the two modes of finance are equivalents for purposes of General Statutes §§ 21-44 and 21-45. In a typical pawnbroking loan, the pawnbroker lends money to his customer in return for a pledge of personal property. The customer can reclaim the pledged property by repaying the principal of the loan with interest. The pawnbroker may sell the property to the general public if the customer does not repay the loan within a predetermined period of time. In a repurchase transaction, the customer sells his property to the pawnbroker and retains an option to repurchase it within a specified period of time at a higher price. The difference between the repurchase price and the original sales price of the item amounts to a fee that the customer must pay for the use of the pawnbroker's money. Whether or not the parties to the transaction label it as interest, this premium constitutes the type of indirect interest envisaged by the drafters of §§ 21-44 and 21-45. Because repurchase transactions satisfy the descrip-

tion of regulated financing arrangements contained in § 21-44, we conclude that pawnbrokers who engage in repurchase transactions are subject to the restrictions imposed by §§ 21-44 and 21-45.

Our conclusion comports with the remedial purpose of pawnbroking statutes. We have long recognized that pawnbroking is a business "peculiarly demanding special regulation." *Sinclair, Scott Co.* v. *Miller,* 80 Conn. 303, 307, 68 A. 257 (1907); accord *State* v. *Griffith,* 83 Conn. 1, 74 A. 1068 (1910), aff'd, 218 U.S. 563, 31 S. Ct. 132, 54 L. Ed. 1151 (1910). In enacting these statutes, the legislature sought to protect impecunious borrowers from extortionate interest rates and oppressive financing terms that some pawnbrokers might otherwise impose. See *State* v. *Hurlburt,* supra, 236. At the time of the passage of the predecessors to General Statutes §§ 21-44 and 21-45, repurchase transactions were recognized as vehicles used by unscrupulous pawnbrokers to extract usurious interest rates from their customers. One early twentieth century commentator, in his comprehensive treatise on the development of the law of pawnbroking, observed: "The greatest evil of the small money lending business is caused throughout the United States by those ubiquitous individuals who assist persons in need through bills of sale, with agreement which includes a right to repurchase. Instead of the regular pawnbroker's ticket there passes between the borrower and the money lender agreements, by means of which the latter expects to gain quicker and higher returns than if he conducted his business as a pawnbroker . . . . *The money lender is in many cases a duly licensed pawnbroker whose transactions must be shown by means of tickets.* But he conducts the transaction under the guise of a purchase with the right of repurchase agreement. This system permits him to evade all pawnbroking laws, and make a greater profit than

if he charged the pawnbroker's interest." (Emphasis added.) S. Levine, A Treatise on the Law of Pawnbroking (1911) pp. 115–16. If we were to construe §§ 21-44 and 21-45 to exclude repurchase transactions from coverage as urged by the plaintiff, we would in effect leave such financing arrangements virtually unregulated.

When viewed alongside analogous statutes regulating consumer transactions[7] and small loans,[8] the restrictions governing the pawnbroking industry represent examples of a general policy designed to prevent over-

[7] See, e.g., General Statutes §§ 42-83 through 42-184, passim; §§ 21-2 through 21-100 passim; §§ 21a-1 through 21a-346 passim.

[8] "The purpose of our Small Loan Act was to furnish an opportunity for borrowing, to persons of small means who might be in need of money and unable to obtain it to relieve their necessities, at ordinary commercial rates . . . . We may fairly assume legislative recognition of the fact that the privilege of loaning money at a rate of interest greatly in excess of the legal rate permitted in ordinary business transactions, naturally called for strict limitations upon the lender and for measures of protection to the borrower who was forced to make such agreements by the necessities of his situation." *Nicotera Loan Corporation* v. *Gallagher,* 115 Conn. 102, 104–105, 160 A. 426 (1932). General Statutes § 36-233 (a) sets forth the maximum interest rates that may be charged by those licensed to make small loans, which are loans not exceeding five thousand dollars: "Sec. 36-233. CHARGES. LOAN RESTRICTIONS. (a) Every licensee under this chapter may loan any sum of money not exceeding five thousand dollars, excluding charges, and may charge, contract for and receive thereon charges at a rate not to exceed the following: (1) On any loan which does not exceed one thousand eight hundred dollars, excluding charges, or on any unsecured loan or on any loan secured only by credit life insurance, seventeen dollars per one hundred dollars on that part of the cash advance, not exceeding six hundred dollars, and eleven dollars per one hundred dollars on any remainder when the loan is made payable over a period of one year, and proportionately at those rates over a longer or shorter term of loan; (2) on a loan which exceeds one thousand eight hundred dollars, excluding charges, and which is secured by property other than credit life insurance, eleven dollars per one hundred dollars on the entire cash advance when the loan is made payable over a period of one year, and proportionately at that rate over a longer or shorter term of loan. Such charges shall be computed at the time the loan is made on the full amount of the cash advance for the full term of the loan contract, notwithstanding any agreement to repay the loan in instalments. Such charges shall be added to the cash advance and the resulting sum may become the face amount of the note. All payments made on account

bearing lenders and commercial entrepreneurs from exploiting impecunious borrowers and consumers who lack bargaining power. Cf. *Fairfield Credit Corporation* v. *Donnelly,* 158 Conn. 543, 551, 264 A.2d 547 (1969). In the absence of any clear manifestation of a legislative intent to define pawnbroking transactions narrowly, and thereby to contradict the strong public policy that favors protection of those who must have recourse to pawnbrokers, we will not impute such a purpose to the legislature.

The plaintiff challenges this conclusion by comparing the language of § 21-39,[9] a licensing statute for

of any loan, except those applied to default and deferment charges, shall be deemed to be applied to the unpaid instalments in the order in which they are due."

These interest rate restrictions, read together with the restrictions set forth in § 21-44, illustrate that by legislative design low income borrowers were not to be charged any more than the prescribed interest rates in any type of small loan transaction, including the pawn transaction. The interest rates charged by the plaintiff, which exceed both the rates established in the pawnbroking statutes and in the Small Loan Act, are well above the rates which the legislature considers reasonable in either context.

Moreover, the language of the Small Loan Act, which also refers to interest charged "directly or indirectly," provides additional evidence that the clause was used in § 21-44 as an all-encompassing term designed to include virtually any transaction in which a pawnbroker takes or receives, directly or indirectly, excess interest on a loan. General Statutes § 36-243 provides, in relevant part: "Sec. 36-243. CHARGE OF GREATER THAN LEGAL INTEREST. No person, partnership, association or corporation, except as authorized by the provisions of this chapter, shall, directly or indirectly, charge, contract for or receive any interest, charge or consideration greater than twelve per cent per annum upon the loan, use or forbearance of money or credit of the amount or value of five thousand dollars or less. The provisions of this section shall apply to any person who, as security for any such loan, use or forbearance of money or credit, makes a pretended purchase of property from any person and permits the owner or pledgor to retain the possession thereof, or who, by any device or pretense of charging for his services or otherwise, seeks to obtain a greater compensation than twelve per cent per annum. . . ."

[9] "[General Statutes] Sec. 21-39. LICENSE REQUIRED. LOANS ON INTANGIBLE PROPERTY EXCEPTED. No person, corporation or partnership shall, in any city or town of this state, engage in or carry on the business of loan-

pawnbrokers that specifically states that repurchase transactions are subject to its provisions, with the language of §§ 21-44 and 21-45, which does not expressly mention repurchase transactions. He points out that in 1905, the legislature amended the predecessor to § 21-39[10] to incorporate a reference to repurchase transactions, but made no similar alteration in the

---

ing money upon deposits or pledges of wearing apparel, jewelry, ornaments, household goods or other personal property, or of purchasing such property on condition of selling the same back again at a stipulated price, unless such person, corporation or partnership is licensed as a pawnbroker; but the provisions of this chapter shall apply only if such property is deposited with a lender, and shall not apply to loans made upon stock, bonds, notes or other written or printed evidence of ownership of property or of indebtedness to the holder or owner of any such securities.''

General Statutes § 21-40 contains similar language: "ISSUANCE OF LICENSES. FEES. The selectmen of any town and the chief of police of any city may grant licenses to suitable persons to be pawnbrokers and to carry on the business of lending money on the pledge of personal property, or of purchasing such property on condition of selling it back again at a stipulated price, in such town or city respectively, and may revoke such licenses for cause; but the selectmen shall not grant such licenses for the carrying on of such business within the limits of any city. The person so licensed shall pay, for the benefit of any such city or town, respectively, to the authority granting such license a license fee of fifty dollars, and twenty-five dollars per year thereafter for renewal of such license, and shall, at the time of receiving such license, file, with the mayor of such city or the first selectman of such town, a bond in such city or town, with competent surety in the penal sum of two thousand dollars, to be approved by such licensing authority, and conditioned for the faithful performance of the duties and obligations pertaining to the business so licensed. Each such license shall designate the place where such business is to be carried on and shall continue one year unless sooner revoked.''

[10] Prior to 1905, General Statutes (Rev. to 1902) § 4655, the predecessor to § 21-39, provided: "§ 4655. LICENSES AND FEES. The selectman of any town, and the chief of police of any city, may grant licenses to suitable persons to be pawnbrokers and to carry on the business of loaning money on the pledge of personal property, in such town or city respectively, and may revoke such licenses for cause; but selectmen shall not grant such licenses for the carrying on of such business within the limits of any city. The person so licensed shall pay for the benefit of any such city or town respectively, to the authority granting such license not less than ten nor more than fifty dollars therefor, to be determined by the authority granting the license. Every license granted under this section shall designate

predecessors to §§ 21-44 and 21-45.[11] Arguing that the legislature would have also amended §§ 21-44 and 21-45 if it had intended these sections to apply to repurchase transactions, he cites the legislature's failure to do so as compelling evidence that the statutes do not encompass repurchase agreements. We find the plaintiff's contention unpersuasive.

There is no legislative history that explains why repurchase transactions are not expressly mentioned

the place where such business is to be carried on, and shall continue one year unless sooner revoked."

The statute, as amended in 1905, provided: "*Be it enacted by the Senate and House of Representatives in General Assembly convened:* "SECTION 1. No person, corporation, or partnership shall, in any city or town of this state, engage in or carry on the business of loaning money upon deposits or pledges of wearing apparel, jewelry, ornaments, household goods, or other personal property, or of purchasing such property on condition of selling the same back again at a stipulated price, unless such person, corporation, or partnership is licensed as a pawnbroker; but the provisions of this act shall apply only if such property is deposited with a lender, and shall not apply to loans made upon stock, bonds, notes, or other written or printed evidence of ownership of property or of indebtedness to the holder or owner of any such securities.

"SEC. 2. The selectmen of any town, and the chief of police of any city, may grant licenses to suitable persons to be pawnbrokers and to carry on the business of lending money on the pledge of personal property, or of purchasing such property on condition of selling it back again at a stipulated price, in such town or city respectively, and may revoke such licenses for cause; but the selectmen shall not grant such licenses for the carrying on of such business within the limits of any city. The person so licensed shall pay, for the benefit of any such city or town respectively, to the authority granting such license a license fee of fifty dollars, and shall, at the time of receiving such license, file with the mayor of such city, or the first selectman of such town, a bond to such city or town, with competent surety, in the penal sum of two thousand dollars, to be approved by such licensing authority, and conditioned for the faithful performance of the duties and obligations pertaining to the business so licensed. Every license granted under this section shall designate the place where such business is to be carried on, and shall continue one year unless sooner revoked." Public Acts 1905, c. 235, §§ 1 and 2.

[11] Prior to 1905, the predecessors to General Statutes §§ 21-44 and 21-45 appeared as follows: "[General Statutes] § 4659. RATE OF INTEREST LIMITED. Pawnbrokers and loanbrokers, and all persons who loan money

in §§ 21-44 and 21-45 when they do appear in § 21-39. It is likely that the legislature omitted such specific references because it believed that §§ 21-44 and 21-45, in addressing themselves to financial arrangements that call for the payment of indirect, as well as direct, interest in return for the use of money, already adequately indicated that they apply to such transactions.

We further note that the legislature manifested its intent, in General Statutes § 21-39 et seq., to regulate conduct that impinges on all aspects of pawnbroking. These statutes do not merely establish licensing requirements, interest rate restrictions and retention periods. They also make pawnbrokers accountable to city officials on a regular basis requiring, for example, that they periodically furnish business records and

on the pledge of personal property, are prohibited from taking or receiving, directly or indirectly, any more than at the rate of twenty-five per cent. per annum for the use of money loaned on personal property."

"[General Statutes] § 4660. PLEDGES TO BE KEPT SIX MONTHS. It shall be unlawful for any such lender to sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid."

The 1905 legislation amended these statutes to provide: "SEC. 7. Pawnbrokers and loan brokers, and all persons who loan money on the pledge of personal property, are prohibited from taking or receiving directly or indirectly, for the use of money loaned on personal property, any more than the following rates: for the use of money amounting to fifteen dollars or under, five per centum per month, or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per centum per month, or fraction thereof; for the use of money exceeding fifty dollars in amount, two per centum per month, or fraction thereof.

"SEC. 8. It shall be unlawful for any such lender to sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid. All such property shall be sold or disposed of, at public or private sale, only after advertisement in a daily newspaper published in the town in which the said lender does business, at least once two days before the date of sale or sales, which said advertisement shall state the numbers of the pledge tickets representing the property which shall be offered for sale, and the date or dates when said tickets were issued." Public Acts 1905, c. 235 §§ 7 and 8.

sworn statements which describe the transactions they have conducted. General Statutes §§ 21-41, 21-43. City officials thereby serve as industry watchdogs, responsible for scrutinizing the activities of pawnbrokers and guarding against any illegal practices. General Statutes § 21-42, furthermore, requires pawnbrokers to give each customer a receipt containing information about the customer and the item pawned or pledged. It would have been unreasonable for the legislature to have required pawnbrokers who conduct repurchase transactions to be licensed, without also requiring their compliance with these other pawnbroking statutes. We note that the plaintiff has failed to cite any prior instance in the last eighty years in which a repurchase transaction has been argued to fall outside of the regulatory scope of our pawnbroking statutes.

We therefore conclude that the trial court correctly held that repurchase transactions are subject to the restrictions contained in §§ 21-44 and 21-45.

There is no error.

In this opinion the other justices concurred.