NICOTRA WIELER INVESTMENT MANAGEMENT, INC.
*v.* MELVIN GROWER
(13240)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued March 2—decision released May 10, 1988

*Gurdon H. Buck,* with whom, on the brief, were *Sally S. King* and *Lori Wilson,* for the appellant (defendant).

*Jeffrey J. Mirman,* with whom were *Richard Kuzmak* and, on the brief, *Matthew N. Perlstein,* for the appellee (plaintiff).

PETERS, C. J. The principal issue in this case is whether the tenant of a residential apartment complex that is being converted to common interest ownership has an exclusive right to purchase the apartment that he occupies even though the conversion plan does not make the apartment available for sale as a separate unit. The plaintiff, Nicotra Wieler Investment Management, Inc., brought this summary process action against the defendant, Melvin Grower, alleging the expiration of an oral lease by lapse of time. The defendant refused to vacate the apartment principally because the plaintiff had not complied with General Statutes §§ 47-284[1] and 47-285,[2] which govern the rights of ten-

[1] "[General Statutes] Sec. 47-284. CONVERSION TENANT'S RIGHT TO CONVERSION NOTICE AND PUBLIC OFFERING STATEMENT. (a) At least one hundred eighty days before a conversion tenant will be required to vacate a converted unit, other than for reasons permitted by subsection (b) of section 47a-23c, and, if a tenant has a purchase right pursuant to section 47-285, at least ninety days prior to the sale of the converted unit by the declarant to a person other than a conversion tenant, a declarant shall give that tenant a conversion notice and provide that tenant with a public offering statement when otherwise required by section 47-263 or 47-267.

"(b) The conversion notice shall inform a tenant of: (1) The date the declarant converted, or intends to convert, the building to a common interest form of ownership; (2) the right of the tenant during the transition period to protection from eviction; (3) the exclusive right of the tenant, as described in section 47-285, to purchase his converted unit during the first ninety days after receipt of the conversion notice; (4) the right of the tenant, as described in section 47-286, to terminate his tenancy and abandon his converted unit on thirty days notice, and the right of each qualified tenant, as described in section 47-287, to a relocation payment; (5) the availability from the department of housing of information concerning governmental assistance to (A) purchase the converted unit or alternative housing, or (B) find, and relocate to, alternative housing; and (6) the address and phone number for information concerning the availability of relocation payments and for information from the department of housing concerning governmental assistance.

"(c) The conversion notice and public offering statement shall be hand-delivered or sent by certified mail, return receipt requested, to the address of the dwelling unit and to any other mailing address provided by a tenant."

[2] "[General Statutes] Sec. 47-285. CONVERSION TENANT'S RIGHT TO PURCHASE CONVERTED UNIT. (a) For the first ninety days after giving a conversion notice to a tenant, a declarant shall offer to convey the converted

ants in the conversion process. The trial court rendered a judgment awarding possession to the plaintiff. We find no error.

There is no dispute about the relevant facts. The defendant occupies an apartment at the Folly Brook Manor complex in Wethersfield, which is managed and operated by the plaintiff. The complex consists of nine separate groups of buildings. Each building contains four apartment units. In August, 1983, the owner of the complex was Creative Real Estate Marketing Investments (CREMI). About August 30, 1983, CREMI designated the complex for development as a planned unit modular complex within the authority conferred by the Connecticut Common Interest Ownership Act (CIOA). General Statutes § 47-200 et seq. To initiate this new form of ownership, CREMI filed a "Declaration of Covenants, Easements, Reservations and Tenancies in Common" in the land records of Wethersfield. Accord-

---

unit occupied by that tenant to that tenant. If a tenant fails to purchase the converted unit during that ninety-day period, the declarant may not offer to dispose of an interest in that converted unit during the following one hundred eighty days at a price or on terms more favorable to the offeree than the price or terms offered to the tenant. This provision does not apply to any unit which will be restricted exclusively to nonresidential use or the boundaries of which do not substantially conform to the dimensions of the unit before conversion.

"(b) If a declarant, in violation of subsection (a) of this section conveys a converted unit to a purchaser for value who has no knowledge of the violation, the recordation of the deed conveying that converted unit, or, in a cooperative, the conveyance, extinguishes any right a tenant may have under subsection (a) of this section to purchase if the deed or conveyance states that the declarant has complied with said subsection (a), but does not affect the right of a tenant to recover damages under section 47-292 from the declarant for a violation of said subsection (a).

"(c) If a tenant fails to purchase the converted unit during that ninety-day period, and the declarant thereafter enters into a contract to sell that unit to a third person, the declarant shall, within one month of executing that contract, notify the tenant of the name and address of the contract purchaser. The declarant's failure to comply with this subsection shall not constitute a defect in the title which he conveys to a third person, or otherwise affect the marketability of title to that unit."

ing to the declaration, CREMI agreed to convey the land and common improvements, such as paved parking areas and concrete walkways, to the newly-created Folly Brook Manor Owners Association, Inc. As for the apartment structures, CREMI declared its intent to sell each of the forty-six buildings to various investors, who in turn would lease the land and common improvements from the owners association. In sum, the units for sale under the declaration consisted of the four-apartment buildings, not the individual dwelling units.

In conjunction with the conversion, CREMI sent a form letter to the defendant describing the change in ownership structure. This letter explained that the "general nature of [Folly Brook] Manor as a rental complex has not been changed" and that rental payments would be due under the terms of existing leases. The defendant was told that "[y]ou may live in your apartment under your existing lease until your lease expires." CREMI further stated that no evictions would occur except for designated causes, including nonpayment of rent, removal of the apartment from the rental market or material noncompliance with the lease. Finally, with respect to purchase rights, the letter stated that "[b]ecause the boundaries of the units have been changed from individual apartments to groups of four (4) apartments, we cannot offer you an exclusive right to purchase your apartment. If you are interested, however, in purchasing a modular group of four (4) apartments, please do not hesitate to call us."

On July 19, 1984, the plaintiff served on the defendant a notice to quit possession of the premises by July 31, 1984. The notice alleged that an oral lease had expired by lapse of time. When the defendant did not vacate the premises, the plaintiff brought the instant summary process action on August 8, 1984. Thereafter, on October 10, 1984, the defendant moved to dismiss the action because the plaintiff had not provided him

a proper conversion notice and public offering statement as required by General Statutes §§ 47-284 and 47-285. In particular, the defendant claimed that the letter he had received from CREMI failed to offer him an exclusive right to purchase his apartment for a specified period.[3]

In a memorandum of decision dated December 16, 1985, the trial court denied the motion to dismiss. It was uncontested that the defendant had not been provided a conversion notice and a public offering statement. Whether the defendant was thereby protected from an eviction depended, according to the trial court, on a threshold question: did the conversion provisions of CIOA require the plaintiff to provide such documents in this case? After examining the relevant statutory provisions, the trial court decided that the tenant in this case stood outside the intended scope of CIOA. The trial court appears to have rested its decision on two alternate grounds. The court first held that the defendant was not a "conversion tenant" for whom the provisions of CIOA afford protection. In the alternative, the court also denied relief because § 47-285 (a) contains an exception that applies when the unit for sale does not "substantially conform to the dimensions of the unit before conversion." Of particular significance to the trial court in both holdings were the provisions of CIOA that give to developers latitude in declaring and defining the "units" that are for sale in a newly-declared common interest community. General Statutes §§ 47-202 (31) and 47-224 (a) (5).[4] This freedom

---

[3] The defendant also claimed that the notice to quit was improperly signed and that the notice directed him to vacate prior to the expiration of the lease. The trial court ruled for the plaintiff on both of these claims. The defendant has not challenged this ruling on appeal.

[4] General Statutes § 47-202 (31) provides: "DEFINITIONS. In the declaration and bylaws, unless specifically provided otherwise or the context otherwise requires, and in this chapter . . .

"(31) 'Unit' means a physical portion of the common interest commu-

to characterize as a "unit" whatever portion of the development is to be sold separately could not, the trial court reasoned, be squared with the defendant's claim of the right to purchase his dwelling unit. Under the defendant's view, the court believed that "the result would be difficult and unfathomable. How could each of four tenants have exclusive right to purchase the building which, not the individual apartments, was the only item available for conversion/sale?"[5]

Subsequent to this decision, the defendant filed his answer and special defenses. The defenses essentially recounted the grounds for dismissal under CIOA that had already been rejected by the trial court in its prior

nity designated for separate ownership or occupancy, the boundaries of which are described pursuant to subdivision (5) of subsection (a) of section 47-224. If a unit in a cooperative is owned by a unit owner or is sold, conveyed, voluntarily or involuntarily encumbered or otherwise transferred by a unit owner, the interest in that unit which is owned, sold, conveyed, encumbered or otherwise transferred is the right to possession of that unit under a proprietary lease, coupled with the allocated interests of that unit, and the association's interest in that unit is not thereby affected."

General Statutes § 47-224 (a) (5) provides: "CONTENTS OF DECLARATION. (a) The declaration shall contain . . . (5) In a condominium or planned community, a description of the boundaries of each unit created by the declaration, including the unit's identifying number or, in a cooperative, a description, which may be by surveys or plans, of each unit created by the declaration, including the unit's identifying number, its size or number of rooms, and its location within a building if it is within a building containing more than one unit."

[5] The defendant proposes a way out of the conundrum noted by the trial court. He urges in his brief, as he did before the trial court, that, under the unique circumstances of this case, his statutory right can be given full effect by allowing him to purchase an undivided one fourth interest in the unit that is for sale, i.e., the four-apartment building. At oral argument, the defendant initially claimed that he had an unequivocal right to purchase his own apartment. Under questioning in rebuttal, however, the defendant clearly conceded that he sought only to purchase a one fourth interest in the unit for sale. Because we decide the threshold question of whether he enjoys any purchase right under CIOA against the defendant, we need not consider the feasibility of either proposed remedy.

memorandum.[6] In its final judgment rendered on August 18, 1987, the trial court found for the plaintiff on the special defenses and on the question of possession for lapse of an oral lease. As its rationale for denying the special defenses, the trial court expressly incorporated its prior memorandum on the motion to dismiss.

On appeal, the defendant claims that his eviction is improper because the trial court erred in: (1) holding that a proper conversion notice, with its attendent exclusive purchase right, was not required in this case; and (2) not requiring the plaintiff to provide a public offering statement to him. We find no error.

I

In order properly to review these claims of error, we must briefly survey the conversion provisions of CIOA in the context of the act as a whole. The Common Interest Ownership Act is a comprehensive legislative scheme regulating all forms of common interest ownership that is largely modeled on the Uniform Common Interest Ownership Act. Public Acts 1983, No. 83-474. A "common interest community" is defined chiefly by the fact that each unit owner is obligated to pay certain charges, such as taxes and insurance premiums, attributable to common property held jointly by the owners through their association. General Statutes § 47-202 (7).[7]

---

[6] Seizing on this apparent repetition to invoke the law of the case doctrine, the plaintiff filed a motion to strike the CIOA special defenses. While acknowledging its prior ruling, the trial court, in the exercise of its discretion, denied the motion to strike in order to preserve an opportunity, at a later stage in the case, to correct "any clearly erroneous view working manifest injustice."

[7] General Statutes § 47-202 (7) provides: "DEFINITIONS. In the declaration and bylaws, unless specifically provided otherwise or the context otherwise requires, and in this chapter . . . .

"(7) 'Common interest community' means real property described in a declaration with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for (A) real property taxes on, (B) insurance pre-

Part V[8] of the act sets forth special rules for the protection of tenants who occupy apartments in existing structures that are being converted to common interest communities.. General Statutes §§ 47-282 through 47-293. In a statement of policy, the legislature declared the need for statewide action to preserve the stock of leased dwelling units in the face of the quickening tempo of conversions. General Statutes § 47-282. Because tenants who occupy buildings undergoing conversions often bear a disproportionate burden in this process, the legislature has established a regime of both substantive and procedural rights that must be respected by developers in this state. Three principal rights are: the exclusive right to purchase one's apartment for a specified period of time, a relocation payment of up to one thousand dollars and a guarantee against rent increases during the transition period. See General Statutes §§ 47-285, 47-287 and 47-289.

## A

CIOA affords its panoply of protection to a special type of person known under the act as a "conversion

miums on, (C) maintenance of, or (D) improvement of, any other real property other than that unit described in the declaration. 'Ownership of a unit' includes holding a leasehold interest of forty years or more in a unit, including renewal options. An association of property owners funded solely by voluntary payments from those owners is not a common interest community."

[8] The Common Interest Ownership Act has five major parts. Part I of the act contains general provisions, including definitions of the three forms of common interest ownership: the condominium; General Statutes § 47-202 (8); the cooperative; General Statutes § 47-202 (10); and the planned community, a residual category of developments that are not condominiums or cooperatives but nonetheless come within the scope of the act. General Statutes § 47-202 (23). Part II of the act governs the creation, alteration and termination of common interest communities. General Statutes §§ 47-220 through 47-242. Part III concerns the managerial aspects of the common interest community, including the organization and power of the unit owners association. General Statutes §§ 47-243 through 47-261. Part IV affords protection to unit buyers through its disclosure and warranty provisions. General Statutes §§ 47-262 through 47-281.

tenant." This term is defined as "a tenant who occupies a dwelling unit both before and after it becomes a converted unit." General Statutes § 47-283 (3). The preliminary question in this case is whether the defendant is a "conversion tenant." Only if this status has attached to the defendant as a consequence of the conversion in this case do the rights available under CIOA become enforceable.

The defendant in this case meets the statutory requirement for a "conversion tenant." The definition of this term in § 47-283 (3) essentially ties the status of being a "conversion tenant" to the occupancy of an apartment that "becomes a converted unit." A "converted unit" is defined as "a dwelling unit that (A) was not in a common interest community when originally leased to its current tenant and (B) is now in a common interest community or is located in a building in which a unit is being offered for sale as part of a common interest community." General Statutes § 47-283 (2).

Applying these criteria in this case, we are persuaded that the evidence adduced at trial shows that the defendant fits the definition of a "conversion tenant." It is undisputed that the defendant resided at Folly Brook Manor prior to its conversion to a common interest community. The defendant attested, in an undisputed affidavit, that he took leased occupancy of his apartment prior to August 30, 1983, the date of conversion. The second element in this definition of a "conversion tenant" is also uncontroverted. The evidence overwhelmingly indicates that the entire Folly Brook Manor complex, including the dwelling unit leased to the defendant, is now a common interest community.

The plaintiff nevertheless argues that a "conversion tenant" comes into being only when the conversion plan calls for the sale of individual dwelling units. Its argument, in syllogistic terms, is that only "converted

units" must be offered for sale to tenants; that a "converted unit" is defined in the statute as a "dwelling unit"; and that because no separate "dwelling unit" has been offered for sale in this case there can be no "conversion tenant." This argument cannot be squared with the express terms of the statutory definition of "conversion tenant." The clear language of the interlocking definitions in § 47-283 (2) and (3) provide the dispositive criteria for determining whether a particular tenant is a "conversion tenant." Contrary to the holding of the trial court, we therefore conclude that the defendant is a "conversion tenant."

## B

We turn, then, to the more difficult question of whether the defendant was entitled to receive a conversion notice in this case. Although a conversion tenant is entitled to notice of his or her exclusive right to purchase the apartment, that entitlement applies only if such a purchase right exists. General Statutes § 47-284 (b) (3). Whether the purchase right exists depends on the language of § 47-285 (a), which provides that "a declarant shall offer to convey the converted unit occupied by [the conversion] tenant to that tenant" for a specified period. This broad right is subject, however, to an exception in the final sentence of § 47-285 (a): "This provision does not apply to any unit . . . the boundaries of which do not substantially conform to the dimensions of the unit before conversion." The outcome of this case hinges on the proper construction of this exception.

The parties offer starkly disparate interpretations of this exception. According to the defendant, only if the actual physical walls, ceilings or floors of a preconversion dwelling unit are substantially changed does the exception apply. The plaintiff, on the other hand, argues that the exception is triggered whenever a

declarant chooses to define and sell as a "unit" any bundle of property that is substantially different than the dimensions of a single dwelling unit. We agree with the plaintiff.

In determining whether CIOA affords the relief that the defendant seeks, it is axiomatic that we strive to ascertain and give effect to the apparent intent of the legislature. *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d 753 (1987). "In reaching this goal, we consider first whether the language of the statute yields a plain and unambiguous resolution. *Rhodes* v. *Hartford,* 201 Conn. 89, 93, 513 A.2d 124 (1986). Any latent ambiguity in the statutory language itself is normally resolved by turning for guidance to the legislative history and the purpose the statute is to serve. *State* v. *Kozlowski,* 199 Conn. 667, 673, 509 A.2d 20 (1986)." *State* v. *Champagne,* 206 Conn. 421, 428, 538 A.2d 193 (1988). In addition, we consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation. *Dukes* v. *Durante,* 192 Conn. 207, 214, 471 A.2d 1368 (1984). In this same vein, CIOA refers to itself as a "general act intended as a unified coverage of its subject matter . . . ." General Statutes § 47-208.

On its face, the language of the exception in § 47-285 neither absolutely supports nor absolutely refutes the defendant's exclusive right to purchase his apartment. The chief source of ambiguity in the statute is its use, at two junctures, of the term "unit" without explicit qualification. The CIOA lexicon contains at least three types of units: the "unit" defined by the declarant for separate ownership or occupancy; § 47-202 (31); the "converted unit" defined in § 47-283 (2); and the "dwelling unit" used occasionally in the act but nowhere defined. It is our task to construe § 47-285 (a) in the context of the act as a whole so as to ascribe appropriate meanings to the exception's two uses of the term "unit."

Both parties urge us to clarify the meaning of "unit" in § 47-285 by interpolating additional terminology into the language of the statute. The defendant urges us to construe both uses of the term "unit" as references to "dwelling unit." So clarified, the exception would apply only if the physical dimensions of a dwelling unit after the conversion do not substantially conform to its pre-conversion dimensions. The plaintiff, to the contrary, urges us to interpret the first "unit" as the bundle of property defined by the declarant in accordance with § 47-202 (31) and the second "unit" as a "dwelling unit." So clarified, the exception would apply whenever the unit for sale does not substantially conform to the dwelling unit before conversion.

Two principal reasons persuade us to agree with the plaintiff. First, the neighboring terminology clarifies the intended meanings of the term "unit." The exception begins with the language that "[t]his provision does not apply to any unit . . . the *boundaries* of which" are substantially changed. (Emphasis added.) A "boundary" is the device by which the developer defines a "unit" under the act. See General Statutes §§ 47-202 (26) and (31), 47-224 (5), 47-228 (e) and 47-230 (3). Once defined, the "unit" owner is not only vested with certain allocated interests; General Statutes § 47-202 (2); but also with certain liabilities. General Statutes § 47-249. A "boundary" created in the declaration may, or may not, correspond to the physical dimensions of a dwelling unit. The mere removal of partitions between adjoining units, for example, is not an alteration of a "boundary." General Statutes § 47-230. Instead, boundaries are relocated by amending the declaration on application to the unit owners association. General Statutes § 47-231. In sum, the term "boundaries," with its fixed correlation to the exercise of development rights, clarifies the meaning of the first "unit."

The subsequent use of the term "unit" in § 47-285 (a), in its full rendition, refers to the "unit *before conversion.*" (Emphasis added.) A "unit before conversion" must be a dwelling unit or apartment since, prior to conversion, there is neither a "unit" nor a "converted unit" within the purview of CIOA. In addition, by describing the latter "unit" as having "dimensions" instead of "boundaries," the statute has provided further guidance that the second use of the term "unit" was meant in the ordinary sense of an apartment. Accordingly, the plaintiff's interpretation finds support in the language of the exception as a whole.

Second, the plaintiff's interpretation is consistent with CIOA's express aspiration to serve as a "general act intended as a unified coverage" of its subject matter. General Statutes § 47-208. In creating a common interest community, a declarant has broad latitude in defining the "unit" for separate ownership or occupancy. General Statutes §§ 47-202 (31) and 47-224 (a) (5). A declarant thus may exercise its development rights under part II of the act without regard to the existing dimensions of dwelling units. The § 47-285 exception is an apparent recognition of this possibility.

We note also that our decision today furthers CIOA's overall policy of protecting the existing rental stock in the state. In a statement of policy, § 47-282 (3) declares that "it is in the public interest to preserve a number of leased dwelling units as rentals" for the elderly or infirm. The trial court, after reviewing the conversion instruments, stated that "[t]he only effect this conversion will have on defendant is a change in landlord." The defendant has not challenged this conclusion in any way and our own review of the record reveals no reason to question the trial court's observation.

Applying the exception to this case in accordance with our interpretation of § 47-285 (a), we conclude that

the defendant has no exclusive right to purchase his apartment. The boundaries of the unit offered for sale by CREMI did not substantially conform to the dimensions of the apartment the defendant occupied prior to the conversion. Accordingly, the trial court was correct in holding that no conversion notice was required in this case.

## II

The defendant also claims that his eviction is unlawful because he has not received the public offering statement to which he is entitled. He offers two grounds for reversing the judgment of the trial court: (1) such a statement is a necessary adjunct to his right to purchase his apartment; and (2) his status as a "conversion tenant" per se mandates the service of a public offering statement before any eviction may occur. Because we already have determined that no purchase right exists in this case, we need only address the latter argument.

Before offering any interest in a unit to the public, a declarant is required to prepare a public offering statement in accordance with General Statutes §§ 47-263 through 47-267. In the event that "a conversion tenant will be required to vacate a converted unit, other than for reasons permitted by subsection (b) of section 47a-23c, *and,* if a tenant has a purchase right pursuant to section 47-285 . . . a declarant shall . . . provide that tenant with a public offering statement . . . ." (Emphasis added.) General Statutes § 47-284 (a). The defendant argues that this provision requires service of a public offering statement under two alternative circumstances: when a conversion tenant is impermissibly evicted *or* when such a tenant has a right to purchase his or her apartment. As we interpret the statute, however, the right to a public offering statement is

plainly contingent upon a showing of an impermissible eviction *and* a purchase right.

In reaching this conclusion, we find significance in the use of the word "and" between the two stated conditions. "Where the language of the statute is clear and unambiguous, we have refused to speculate as to the legislative intention, because it is assumed that the words express the intention of the legislature." *Sutton* v. *Lopes,* 201 Conn. 115, 118, 513 A.2d 139 (1986); see *Simko* v. *Zoning Board of Appeals,* 205 Conn. 413, 418, 533 A.2d 879 (1987). We believe that the legislature, in drafting § 47-284 (a) in the conjunctive, meant what it said. A principal purpose of the public offering statement under CIOA is to protect unit purchasers from making uninformed investment decisions. Mandating the service of such statements upon tenants who have no exclusive purchase rights would not materially advance the goal of the statute. A tenant in the shoes of the defendant might, of course, request a public offering statement and the declarant, in seeking to sell property, might voluntarily wish to honor that request. We conclude, however, that the defendant had no statutory right to receive a public offering statement merely because of his status as a "conversion tenant." A declarant is only obligated to provide a public offering statement to conversion tenants who have a "purchase right pursuant to section 47-285 . . . ." General Statutes § 47-284 (a). The trial court therefore correctly rendered a judgment awarding possession of the premises to the plaintiff.

There is no error.

In this opinion the other justices concurred.