******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DOUGLAS GILMORE, EXECUTOR (ESTATE
OF BESS GILMORE) *v.* PAWN
KING, INC., ET AL.
(SC 18848)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

*Argued September 23, 2013—officially released September 16, 2014*

*Jonathan J. Klein*, for the appellant (plaintiff).

*Robert M. Frost, Jr.*, with whom, on the brief, was *Brian E. Tims*, for the appellees (defendants).

*Opinion*

ZARELLA, J. The dispositive issue in the present case, which comes to us upon our acceptance of three certified questions of law from the United States District Court for the District of Connecticut pursuant to General Statutes § 51-199b (d),[1] is whether the interest rates applicable to pawnbroker repurchase agreements are governed by the pawnbroker interest rate statute, General Statutes § 21-44, or the usury statute, General Statutes § 37-4, or whether such agreements are not regulated at all. After considering the language of §§ 21-44 and 37-4, the genealogy of these statutes, and the pawnbroker statutory scheme, we conclude that the interest rates applicable to such repurchase agreements are governed by § 37-4.

The record certified by the District Court contains the following undisputed facts and procedural history. Between 2005 and 2007, the named defendant, Pawn King, Inc. (Pawn King),[2] entered into five separate repurchase transactions with the original plaintiff in this action, Bess Gilmore,[3] pursuant to which Gilmore agreed to sell items of personal property to Pawn King in exchange for an agreed on amount, and Pawn King agreed to hold those items, subject to Gilmore's right to repurchase them. The repurchase agreements set the repurchase price as the original amount that Pawn King had paid to Gilmore for the items, plus a fee of 20 percent of that original amount for each month that Pawn King held the items. The District Court provided the following example: "Pawn King paid . . . Gilmore $1500 for three items—a watch, [a] lighter and [a] bracelet. . . . Gilmore secured the right to repurchase those items within thirty days for $1800—the $1500 original price paid plus $300 (20 [percent] fee). Pawn King would often agree to hold the items longer than thirty days conditioned [on] . . . Gilmore's payment of additional monthly fees of [20] percent."

On June 4, 2008, Pawn King informed Gilmore that, if she did not pay two months of fees on the items that were the subject of three of the repurchase transactions, it would sell those items. On July 1, 2008, when Gilmore contacted Pawn King to arrange payment, it informed her that it had disposed of the items. She demanded that Pawn King return the property, and, when it did not, she initiated this action in the District Court, claiming, inter alia, that Pawn King's actions violated § 21-44. Gilmore alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (a) and (c), and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and also alleged conversion, statutory theft, intentional infliction of emotional distress, unjust enrichment, breach of contract, breach of an implied contract, and breach of the implied duty of good faith and fair dealing.[4]

The defendants filed a motion for summary judgment on the ground that the language of § 21-44 restricts its scope to pawnbroker loans, and, therefore, the rate limits set forth in § 21-44 do not apply to repurchase transactions. Specifically, the defendants contended that Public Acts 1997, No. 97-164, § 5 (P.A. 97-164), legislatively overruled this court's holding in *Rhodes* v. *Hartford*, 201 Conn. 89, 96–97, 513 A.2d 124 (1986), that the pre-1997 version[5] of § 21-44 applied to repurchase transactions, by amending the statute and deleting a key statutory term on which this court had relied in interpreting the statute. In opposition to the defendants' motion for summary judgment, the plaintiff argued that P.A. 97-164, § 5, did not change the meaning of the pre-1997 version of § 21-44, as articulated by this court in *Rhodes*.

The District Court determined that the resolution of the defendants' motion for summary judgment turned on whether, in light of P.A. 97-164, § 5, § 21-44 continues to govern the rates charged by pawnbrokers in repurchase transactions. Because no appellate authority has construed § 21-44 since the 1997 amendment to that statute, and because the question is one of public importance, the District Court certified the following questions to this court: "1. Does . . . § 21-44 restrict 'rates of interest' chargeable by a pawnbroker, or does it more generally restrict the 'rates' chargeable for the use of money obtained from a pawnbroker in connection with a repurchase transaction?

"2. Did the Connecticut [General Assembly], in its 1997 amendment to [the pre-1997 version of] § 21-44, exempt repurchase transactions and the attendant fees charged from the limits on rates received by pawnbrokers?

"3. If so, are repurchase transactions, as described by the court in *Rhodes* v. [*Hartford*, supra, 201 Conn. 89], considered loans subject to the interest rate limits imposed by . . . § 37-4?"

In their brief to this court, the defendants argue that the rates imposed by pawnbrokers in connection with repurchase transactions are not regulated under either § 21-44 or § 37-4. First, the defendants contend that § 21-44 restricts only rates of interest chargeable by a pawnbroker, and, because the rates applicable to repurchase agreements are not rates of interest, such rates do not fall within the scope of the statute. Second, the defendants argue that the legislature exempted repurchase agreements from § 21-44 in P.A. 97-164, § 5, thereby overruling *Rhodes*. Third, the defendants assert that this court should decline to answer the third certified question because it is unnecessary to address it as it does not relate to any of the plaintiff's pending claims. If the court does address this question, however, the defendants posit that § 37-4 does not govern the rates

charged in connection with repurchase agreements because (1) such agreements are not loans as contemplated by the statute, and (2) § 37-4 excludes all pawnbroker transactions.

The plaintiff responds that the rates applicable to repurchase transactions are governed by § 21-44, or, alternatively, they are governed by § 37-4. Repurchase transactions must be regulated, according to the plaintiff, because the pawnbroker statutes are remedial in nature and were intended to protect borrowers from unscrupulous lenders. With respect to the first certified question, the plaintiff contends that § 21-44 governs all rates chargeable for the use of money obtained in connection with a repurchase transaction, rather than just rates of interest. In addition, the plaintiff argues that P.A. 97-164, § 5, did not overrule *Rhodes* because the genealogy of the pawnbroker statutes and the legislative history do not indicate that this amendment was made in response to this court's decision in *Rhodes*. Moreover, the plaintiff posits that, because the legislature removed the words "directly" *and* "indirectly" from the pre-1997 version of § 21-44 in P.A. 97-164, § 5, the scope of § 21-44 did not change. Finally, the plaintiff claims that, if the rates that pawnbrokers charge for repurchase transactions are not governed by § 21-44, then such transactions must be governed by § 37-4.

Although we agree with the defendants that § 21-44 no longer governs the rates that pawnbrokers may charge in connection with repurchase transactions, we also agree with the plaintiff that, because § 21-44 no longer governs repurchase transactions, such transactions are governed by § 37-4. Thus, the answer to the first certified question is that § 21-44 governs rates of interest rather than the rates pawnbrokers may charge in connection with repurchase agreements. The answer to the second certified question is that the legislature exempted repurchase transactions from § 21-44 in P.A. 97-164, § 5. Finally, the answer to the third certified question is that the rates pawnbrokers may charge in connection with repurchase agreements are subject to the rate limits imposed by § 37-4.

I

We begin our analysis with the first and second certified questions, which together ask the court to decide whether § 21-44 governs the rates that pawnbrokers may charge in connection with repurchase transactions. For the reasons set forth hereinafter, we conclude that repurchase transactions are no longer included within the purview of § 21-44.

Because this court previously held in *Rhodes* that the pre-1997 version of § 21-44 encompassed repurchase agreements; see *Rhodes* v. *Hartford*, supra, 201 Conn. 96–97; it is necessary to determine whether the legislature's amendment to the pre-1997 version of § 21-44 in

P.A. 97-164, § 5, altered the scope of the statute. Although "we do not write on a clean slate" when this court previously has interpreted a statute; *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013); whether the legislature has changed the meaning of a statute is a matter of statutory interpretation. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Fedus* v. *Planning & Zoning Commission*, 278 Conn. 751, 756, 900 A.2d 1 (2006).

"[I]t is reasonable to presume that, by rejecting the underlying premise [of a prior decision], the legislature also . . . express[es] its disapproval of [the court's prior] conclusion . . . ." Id., 763–64. The legislature can reject the underlying premise of a decision by changing or deleting a provision on which the court relied. This is especially true when that provision exists elsewhere in the statutory scheme. For instance, "[when] a statute, with reference to one subject, contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." (Internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717, 674 A.2d 845 (1996). This tenet of statutory construction ensures that "statutes [are] construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant, and that every sentence, phrase and clause is presumed to have a purpose."[6] *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980).

In *Rhodes*, the court, relying predominantly on the phrase "directly or indirectly" in the pre-1997 version of § 21-44, decided that the pre-1997 versions of §§ 21-44 and 21-45 applied to repurchase agreements. See *Rhodes* v. *Hartford*, supra, 201 Conn. 96–97. The court in *Rhodes* interpreted the pre-1997 version of § 21-44, which provided in relevant part: "No pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, *directly or indirectly*, for the use of money loaned on personal property, any more than the . . . rates [set forth in the statute] . . . ." (Emphasis added.) The pre-1997 ver-

sion of § 21-45 at issue in *Rhodes* provided in relevant part: "No such lender shall sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid. . . ."

The court concluded in *Rhodes* that these statutes applied to repurchase agreements because repurchase agreements could be characterized as indirect loans that were expressly included within the language of the pre-1997 version of § 21-44.[7] See *Rhodes* v. *Hartford*, supra, 201 Conn. 96. The court observed that "[e]xamination of the language of [the pre-1997 versions of] §§ 21-44 and 21-45 reveals that neither statute plainly defines the pawnbroking activity to which it applies." Id., 93. As a result, the phrase "directly or indirectly" in the pre-1997 version of § 21-44 was crucial to the court's determination of the scope of the statutory scheme. The court reasoned that, "[b]y extending the statutes' coverage to transactions involving the *indirect* payment of interest, the legislature indicated that it intended the statutes to regulate not only those transactions that take the classic form of a conventional pawnbroker loan, but also financing arrangements that, in substance if not in form, amount to the economic [equivalent] of such a loan." (Emphasis added.) *Rhodes* v. *Hartford*, supra, 96.

This interpretation was consistent with the use of the phrase "directly or indirectly" in the small loans interest rate regulatory statute, General Statutes (Rev. to 1993) § 36-243,[8] which provided in relevant part: "No person, partnership, association or corporation . . . shall, *directly or indirectly*, charge contract for or receive any interest, charge, or consideration greater than twelve per cent per annum . . . ." In *Rhodes*, we determined that the language of General Statutes (Rev. to 1985) § 36-243, which was identical in all material respects to the 1993 revision, was "evidence that the clause ['directly or indirectly'] was used in § 21-44 as an all-encompassing term designed to include virtually any transaction in which a pawnbroker takes or receives, directly or indirectly, excess interest on a loan." *Rhodes* v. *Hartford*, supra, 201 Conn. 99 n.8.

Furthermore, even though the plaintiff in *Rhodes* relied on the fact that the pre-1997 version of General Statutes § 21-39 expressly included repurchase agreements, whereas the pre-1997 version of §§ 21-44 and 21-45 did not, the court discounted that fact, reasoning that "[i]t is likely that the legislature omitted such specific references [in the pre-1997 version of §§ 21-44 and 21-45] because it believed that [these two statutes], in addressing themselves to financial arrangements that call for the payment of indirect, as well as direct, interest in return for the use of money, already adequately indicated that they apply to such transactions." Id., 102. The court explained that it "would have been unreason-

able for the legislature to have required pawnbrokers who conduct repurchase transactions to be licensed, without also requiring their compliance with . . . other pawnbroking statutes." Id., 103.

Finally, the court in *Rhodes* emphasized that it interpreted the pre-1997 version of §§ 21-44 and 21-45 to comport with the remedial purpose of the pawnbroker statutes, which was to "protect impecunious borrowers from extortionate interest rates and oppressive financing terms that some pawnbrokers might otherwise impose." Id., 97. Repurchase agreements traditionally had been "vehicles used by unscrupulous pawnbrokers to extract usurious interest rates from their customers." Id. Accordingly, the court indicated that it would have been inconsistent with this policy to leave such transactions unregulated. Id., 98. The court also noted that the pawnbroker statutes were part of a greater, more general policy embodied in the consumer transaction and small loans interest rate statutes, namely, "to prevent overbearing lenders and commercial entrepreneurs from exploiting impecunious borrowers and consumers who lack bargaining power." Id., 98–99.

The legislature subsequently amended the pawnbroker statutes in 1997 and 2011, resulting in several changes that evince the legislature's intent to limit § 21-44 to traditional loans, thereby necessarily excluding repurchase agreements from its scope. See Public Acts 2011, No. 11-100 (P.A. 11-100); P.A. 97-164. First, despite this court's heavy textual reliance on the phrase "directly or indirectly" in *Rhodes*, the legislature removed this language from the pre-1997 version of § 21-44 in 1997.[9] See P.A. 97-164, § 5. Section 21-44 currently provides in relevant part: "No pawnbroker or person who loans money on the deposit or pledge of personal property shall take or receive, for the use of money loaned on personal property, any more than the . . . rates [set forth in the statute] . . . ." This change vitiated the underlying premise of *Rhodes*, as § 21-44 no longer applies to indirect interest.[10] If the legislature had intended to maintain the status quo with respect to § 21-44, it could have demonstrated its acquiescence with our decision in *Rhodes* by maintaining this portion of the statute or substituting other more express language consistent with *Rhodes*.

Second, the legislature added references to repurchase agreements to several other provisions in the pawnbroker statutes, but did not add such language to § 21-44. When *Rhodes* was decided, only the pawnbroker licensing statutes; General Statutes (Rev. to 1985) §§ 21-39 and 21-40; expressly referred to both repurchase agreements and pawnbroker loans. In 1997, however, in the *same public act* that eliminated the phrase "directly or indirectly" from the pre-1997 version of § 21-44, the legislature added language referencing repurchase agreements to other pawnbroker statutes

that previously had referred only to loan transactions.[11] See P.A. 97-164, §§ 3, 4 and 7, respectively codified at General Statutes (Rev. to 1999) §§ 21-41 (a) and (b), 21-42 and 21-47 (b). For instance, the pre-1997 version of § 21-42 provided in relevant part: "Each such pawnbroker shall, at the time of making any loan on a pawn or pledge, deliver to the person who pawns or pledges any goods, article or thing a memorandum or note containing the entry required . . . by the provisions of section 21-41. . . ." General Statutes (Rev. to 1997) § 21-42. The legislature amended the pre-1997 version of § 21-42 in P.A. 97-164, § 4, however, by expressly including repurchase agreements: "Each such pawnbroker shall, at the time of making any loan on a pawn or pledge of personal property or of *purchasing such property on condition of selling the same back again at a stipulated price* or of purchasing such property from a person who is not a wholesaler, deliver to the person who pawns, pledges or *sells* such property a memorandum or note containing the entry required . . . by the provisions of section 21-41 . . . ." (Emphasis added.) P.A. 97-164, § 4, codified at General Statutes (Rev. to 1999) § 21-42.

In 2011, the legislature added language referring to both repurchase agreements and loan transactions to four pawnbroker statutes.[12] See P.A. 11-100, §§ 3, 4, 7 and 8. Notably, in the 2011 amendments, the legislature added repurchase agreement language to § 21-45; see P.A. 11-100, § 7; one of the statutes other than § 21-44 that the court in *Rhodes* considered.[13] See *Rhodes* v. *Hartford*, supra, 201 Conn. 93. Thus, despite the opportunity to add repurchase agreement language to § 21-44 in both 1997 and 2011, which would have clarified that the removal of "directly or indirectly" did not change the scope of the statute as construed in *Rhodes*, the legislature chose not do so on either occasion.

As a result of the foregoing amendments, the pawnbroker statutes use consistent terms in referring to loans and repurchase agreements. These terms conform with the language of the pawnbroker definitional statute, General Statutes § 21-39a, which was added to the scheme in 2011. See P.A. 11-100, § 1. Section 21-39a (1) defines a pawnbroker as "a person who is engaged in the business of *loaning money on the deposit or pledge* of . . . personal property or *purchasing such property on condition of selling the same back again at a stipulated price* . . . ." Accordingly, the current pawnbroker statutory scheme refers to loans using the phrases "loaning money," "loans money," "loan," "money loaned," "take," "deposit," deposited," "pledge" and "pledging"; General Statutes §§ 21-39, 21-39a (1), § 21-41 (a) and (b), 21-42 (a), 21-44, 21-45 and § 21-46a; and refers to repurchase agreements using the terms "sale," "sold," "purchase," "purchasing," and the purchase of "such property on condition of selling the same back again at a stipulated price" General Statutes §§ 21-39a

(1), 21-40 (c), 21-41 (a) and (b), 21-42 (a), 21-45 and 21-46a.

Notably, § 21-44 refers only to loans: "No pawnbroker or person who *loans money* on the *deposit* or *pledge* of personal property shall take or receive, for the use of *money loaned* on personal property, any more than the . . . rates [set forth in the statute] . . . ." (Emphasis added.) In fact, the legislature clarified the references in § 21-44 to loans in the same public act in which the legislature deleted the phrase "directly or indirectly." See P.A. 97-164, § 5. In P.A. 97-164, § 5, the legislature not only removed "directly or indirectly," but also added the word "deposit" and removed the term "loan broker." These changes made the loan references in § 21-44 more consistent with the remainder of the pawnbroker statutory scheme.

Thus, § 21-44 now contains the same loan language present throughout the pawnbroker statutes but does not include *any* language referring to repurchase agreements. It would be anomalous to read the terms "loans money," "money loaned," "deposit" and "pledge" in § 21-44 to include repurchase agreements when such terms are not used to refer to repurchase agreements anywhere else in the statutory scheme. Accordingly, we conclude that the rate that pawnbrokers may charge in connection with repurchase agreements is not governed by § 21-44.

That is not to say, however, that we disagree with the reasoning in *Rhodes*. We agree that the rates charged in connection with repurchase agreements can be considered a form of indirect interest. Nonetheless, because § 21-44 no longer includes indirect interest; see P.A. 97-164, § 5; the reasoning in *Rhodes* is no longer applicable to the current statutory scheme. In addition, *Rhodes* observed that the pre-1997 versions of §§ 21-44 and 21-45 could apply to both loans and repurchase agreements because "neither statute plainly define[d] the pawnbroking activity to which it applies." *Rhodes* v. *Hartford*, supra, 201 Conn. 93. The legislature, however, subsequently clarified the scope of the pawnbroker statutes by adding explicit repurchase agreement language throughout the statutory scheme.

The court in *Rhodes* also relied strongly on the principle that repurchase agreements are "the economic [equivalent] of . . . a loan" in support of its conclusion that the two transactions should be treated similarly for purposes of the pre-1997 versions of §§ 21-44 and 21-45. Id., 96. Although repurchase transactions can be considered a type of loan in theory;[14] see part II of this opinion; the legislature has manifested a clear intent to no longer treat pawnbroker repurchase agreements as the equivalent of a pawnbroker loan. The definition of a "pawnbroker" in § 21-39a (1) explicitly distinguishes between the two transactions[15] rather than simply stating that a pawnbroker deals in direct or indirect loans.

Therefore, although *Rhodes* properly concluded that repurchase agreements can be a type of indirect loan that provides indirect interest, the reasoning of *Rhodes* no longer applies to the current statutory scheme.

## II

The third certified question asks whether pawnbroker repurchase transactions are subject to the lower interest rate cap imposed by the usury statute, § 37-4. Section 37-4 regulates interest rates for all direct or indirect loans by persons or entities, "other than a pawnbroker as provided in section 21-44 . . . ."[16] The defendants contend that repurchase agreements are not subject to either §§ 37-4 or 21-44.[17] As we explain hereinafter, in light of our interpretation of § 21-44 and the reasoning set forth in *Rhodes*, we conclude that pawnbroker repurchase agreements are subject to the lower interest rate cap set forth in § 37-4 and pawnbroker loans are subject to the higher interest rate cap set forth in § 21-44.[18]

The issue of whether § 37-4 applies to pawnbroker repurchase agreements "raises a question of statutory construction . . . over which we exercise plenary review." (Internal quotation marks omitted.) *Weems* v. *Citigroup, Inc.*, 289 Conn. 769, 778, 961 A.2d 349 (2008). Therefore, we apply the same standard of review set forth in part I of this opinion.

Section 37-4 provides: "No person and no firm or corporation or agent thereof, *other than a pawnbroker as provided in section 21-44*, shall, as guarantor or otherwise, *directly or indirectly*, loan money to any person and, *directly or indirectly*, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum." (Emphasis added.) This court previously has determined that a prior, nearly identical version of this statute "brought *every form of loan* within its terms." (Emphasis added.) *State* v. *O'Brien*, 93 Conn. 643, 646, 107 A. 520 (1919). This court also has determined that "the intention of the legislators [in enacting the statute] was to prevent the making of loans under color of a guaranty or *in any other way*." (Emphasis added.) Id.; see also *Bridgeport L. A. W. Corp.* v. *Levy*, 110 Conn. 255, 261, 147 A. 841 (1929) ("[t]he parties . . . must act in good faith, and [when] a *contract appears as a sale but is in fact a mere cloak for* [a] *usurious loan*, it will not be free from the taint of usury" [emphasis added]); *Kjar* v. *Brimley*, 27 Utah 2d 411, 416, 497 P.2d 23 (1972) ("casting a loan transaction in the form of a sale with an option to repurchase will not insulate the transaction from the usury laws").

Because the phrase "directly or indirectly" is ambiguous, we turn to the court's interpretation of the identical phrase in the pre-1997 version of § 21-44 for guidance. See *State* v. *Rhodes*, supra, 201 Conn. 95–97. "In inter-

preting a statute, [r]elated statutory provisions, or statutes in pari materia, often provide guidance in determining the meaning of a particular word . . . ." (Internal quotation marks omitted.) *State* v. *Ehlers*, 252 Conn. 579, 590, 750 A.2d 1079 (2000). In *Rhodes*, the court determined that the phrase "directly or indirectly" in the pre-1997 version of § 21-44, when applied to interest, included the rates charged in connection with repurchase agreements because it evinced the legislature's intent "to regulate not only those transactions that take the classic form of a conventional pawnbroking loan, but also financing arrangements that, in substance if not in form, amount to the economic [equivalent] of such a loan." *Rhodes* v. *Hartford*, supra, 201 Conn. 96.[19] The court in *Rhodes* reasoned that "directly or indirectly" is "an all-encompassing term designed to include virtually any transaction in which a pawnbroker takes or receives, directly or indirectly, excess interest on a loan." Id., 99 n.8.

Section 37-4, like the pre-1997 version of § 21-44, includes direct or indirect interest within its scope and thus encompasses repurchase agreements as well as traditional loans. As we observed in *Rhodes*, repurchase agreements, "in substance if not in form," can be considered the economic equivalent of a loan. Id., 96. Thus, the rates that pawnbrokers charge in connection with repurchase agreements are a form of "indirect" interest included within the terms of § 37-4. The inclusion of repurchase agreements within the purview of § 37-4 also is consistent with the general policy of this state to "prevent overbearing lenders and commercial entrepreneurs from exploiting impecunious borrowers and consumers who lack bargaining power." Id., 98–99.

Although § 37-4 contains an exception for "pawnbroker[s] as provided in section 21-44," this exception does not exclude pawnbroker repurchase agreements because, as we previously explained; see part I of this opinion; such transactions are no longer governed by § 21-44. The phrase "pawnbroker as provided in section 21-44" is an elastic term that allows the scope of § 37-4 to expand and contract with the scope of § 21-44, ensuring that, consistent with the remedial nature of the pawnbroker and usury statutes, all pawnbroker transactions are regulated. Thus, although repurchase agreements were excluded from § 37-4 prior to P.A. 97-164, § 5, § 37-4 now encompasses such transactions because they are not included within the purview of § 21-44.

The defendants claim that the exception to § 37-4 excludes pawnbrokers who engage in both types of transactions because, at the time that the precursor to § 37-4 was enacted, the precursor to § 21-44 included both loans and repurchase agreements.[20] The defendants thus contend that rates charged in connection with repurchase transactions are entirely unregulated.

In addition to the fact that the scope of § 37-4 can change as the scope of § 21-44 changes, there are other reasons that we disagree with the defendants' contention. First, leaving repurchase transactions unregulated would run counter to the remedial purposes of the pawnbroker and usury statutes. "We have long recognized that pawnbroking is a business peculiarly demanding special regulation. . . . In enacting [the pawnbroker] statutes, the legislature sought to protect impecunious borrowers from extortionate interest rates and oppressive financing terms that some pawnbrokers might otherwise impose. . . . At the time of the passage of the predecessors to . . . §§ 21-44 and 21-45, repurchase transactions were recognized as vehicles used by unscrupulous pawnbrokers to extract usurious interest rates from their customers." (Citations omitted; internal quotation marks omitted.) *Rhodes* v. *Hartford*, supra, 201 Conn. 97. Similarly, "[t]he statute of usury was made to protect weak or necessitous men from oppression . . . ." *Camp* v. *Bates*, 11 Conn. 487, 500 (1836). It would be inconsistent with these purposes to allow pawnbrokers to impose oppressive rates on borrowers merely by structuring a transaction as a repurchase agreement rather than as a loan.

We also observe that, if the legislature had intended to exclude pawnbrokers as a class rather than transactions already regulated under § 21-44, the legislature simply could have referenced the pawnbroker chapter generally or one of the pawnbroker statutes defining the business of a pawnbroker. When the legislature enacted the precursor to § 37-4, which contained the exception for pawnbrokers, in 1907; see Public Acts 1907, c. 238, § 1; the pawnbroker statutory scheme contained a provision defining which activities required a pawnbroker license; see Public Acts 1905, c. 235, § 1; and another provision governing interest rates on pawnbroker transactions. See Public Acts 1905, c. 235, § 7. The pawnbroker licensing provision, in defining which activities required a pawnbroker license, effectively defined the term "pawnbroker": "No person, corporation, or partnership shall, in any city or town of this state, engage in or carry on the business of loaning money upon deposits or pledges of wearing apparel, jewelry, ornaments, household goods, or other personal property, or of purchasing such property on condition of selling the same back again at a stipulated price, unless such person, corporation, or partnership is licensed as a pawnbroker . . . ." Public Acts 1905, c. 235, § 1.

The legislature could have demonstrated its intent to exclude pawnbrokers as a class from the usury statute by referencing the pawnbroker licensing statute, but, instead, in 1918, the legislature tied the scope of the usury statute to the scope of the pawnbroker interest rate statute.[21] See General Statutes (1918 Rev.) §§ 3011 and 4798. Similarly, the legislature could have demonstrated its intent to exclude pawnbrokers as a class by

amending § 37-4 to reference the pawnbroker licensing statute, § 21-39, when the legislature removed the words "directly or indirectly" from the pre-1997 version of § 21-44 in 1997. See P.A. 97-164, § 5. Furthermore, the legislature could have amended § 37-4 to reference the pawnbroker definitional statute, § 21-39a, when it was enacted in 2011. See P.A. 11-100, § 1. Such an amendment would have made clear the legislature's intent to exclude an entire class of individuals, rather than transactions not covered under § 21-44, from the purview of § 37-4. In the absence of such an amendment, we are guided by the flexible language of § 37-4 and the remedial purpose of the pawnbroker and usury statutes in concluding that the rate that pawnbrokers may charge in connection with repurchase agreements should be regulated, and, because such rates do not fall within the purview of § 21-44, they must be governed by § 37-4.[22]

The answer to the first certified question is that § 21-44 is restricted to rates of interest and does not govern the rates that pawnbrokers may charge in connection with repurchase agreements; the answer to the second certified question is, yes; and the answer to the third certified question is, yes.

No costs shall be taxed in this court to either the plaintiff or the defendants.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH and McDONALD, Js., concurred.

[1] General Statutes § 51-199b (d) provides: "The Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

[2] William V. Mingione, Pawn King's principal, also was named as a defendant. We hereinafter refer to Pawn King and Mingione collectively as the defendants.

[3] We note that Douglas Gilmore, the executor of Bess Gilmore's estate, was substituted as the plaintiff in this action on October 27, 2009. In the interest of simplicity, we hereinafter refer to Douglas Gilmore as the plaintiff and Bess Gilmore by her surname.

[4] Gilmore also alleged that Pawn King violated the municipal code of the town of Stratford but the plaintiff subsequently conceded that that claim should be dismissed.

[5] When we refer to the pre-1997 versions of §§ 21-39 through 21-42, 21-44 through 21-45, and 21-47, we are referring specifically to the versions of these statutes in effect before October 1, 1997, the effective date of P.A. 97-164.

[6] The dissenting justice contends that we fail to address the question of whether the legislature intended to overrule *Rhodes*. To the contrary, our goal in this opinion is to determine the legislature's intent, which we accomplish in accordance with § 1-2z by beginning our analysis with a review of the text of the statute itself, the relevant statutory scheme, and this court's prior interpretation of the relevant statutes.

[7] With respect to the first certified question, the defendants contend that the term "rates" in § 21-44 is restricted to rates of interest, and, therefore, does not extend to the rates charged in connection with repurchase transactions. In *Rhodes*, however, this court apparently assumed that the term "rates" in the pre-1997 version of § 21-44 was restricted to rates of interest but nonetheless concluded that the term included rates charged in connection with repurchase transactions because those rates were a form of indirect interest. See *Rhodes* v. *Hartford*, supra, 201 Conn. 96.

[8] General Statutes (Rev. to 1993) § 36-243 was transferred to General Statutes § 36a-573 in 1995. General Statutes § 36a-573 provides in relevant part: "(a) No person, except as authorized by the provisions of sections 36a-555 to 36a-573, inclusive, shall, *directly or indirectly*, charge, contract for or receive any interest, charge or consideration greater than twelve per cent per annum . . . ." (Emphasis added.)

[9] Although the 1997 amendment to the pre-1997 version of § 21-44 occurred approximately eleven years after our decision in *Rhodes*, we do not accord this delay great weight in light of the fact that the legislature deleted the very words on which this court relied in its interpretation of the pre-1997 version of the statute. In addition, even in situations in which the legislature has *not* subsequently amended a statute that we have construed, this court has recognized that "legislative inaction . . . is not necessarily legislative affirmation . . . . [T]he legislature's failure to amend a statute in response to our interpretation of that provision is not dispositive of the issue because legislative inaction is not always the best . . . [guide] to legislative intent." (Citations omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 521–22, 949 A.2d 1092 (2008).

[10] We observe that the deletion of the word "directly," in addition to "indirectly," does not render the legislature's 1997 amendment to the pre-1997 version of § 21-44 ambiguous. Presuming, as we must, that the legislature was aware of our decision in *Rhodes*, we must accord great weight to the fact that the legislature deleted the very language on which this court heavily relied. In addition, it would have been repetitive and cumbersome for the legislature to have deleted only the word "indirectly." If the legislature had done so, § 21-44 would provide that no pawnbroker or person who loans money on the deposit or pledge of personal property *shall take or receive*, *directly*, *for the use of money loaned* on personal property, any more than the rates set forth in the statute. Notwithstanding this court's decision in *Rhodes*, the continued use of the word "directly," in light of the removal of the word "indirectly," would have been unnecessary because (1) the scope of the statute already was so limited by the phrase "loans money on the deposit or pledge," (2) the legislature was capable of and did in fact indicate its intent to change the scope of § 21-44 by deleting the phrase on which this court heavily relied in deciding *Rhodes*, and (3) as we subsequently explain, the legislature provided even more evidence of its intent by simultaneously and subsequently adding language to other pawnbroker statutes specifically referring to repurchase agreements.

The dissenting justice states that we mistakenly rely on the 1997 amendment to the pre-1997 version of General Statutes § 21-47; see P.A. 97-164, § 7; because the language in that amendment refers to purchases. See text accompanying footnote 6 of the dissenting opinion. Repurchase transactions, however, are a type of purchase transaction pursuant to which the customer may buy his property back under certain conditions. In fact, repurchase agreements are described as a type of pawnbroker purchase transaction in the statutory scheme. See General Statutes § 21-39a (1) (defining "pawnbroker" in relevant part as "a person who is engaged in the business of [inter alia] . . . *purchasing* . . . property on condition of selling the same back again at a stipulated price" [emphasis added]).

[11] See General Statutes (Rev. to 1999) § 21-41 (a) ("[n]o pawnbroker or person who loans money on the deposit or pledge of wearing apparel, jewelry, ornaments, household goods or other personal property or *purchases such property on condition of selling the same back again at a stipulated price* . . . shall take, receive or *purchase* such property without receiving proof of the identity of the person depositing, pledging or *selling* the property" [emphasis added]); General Statutes (Rev. to 1999) § 21-41 (b) ("[e]ach such pawnbroker or person carrying on such business of loaning money on the deposit or pledge of personal property or of *purchasing such property on condition of selling the same back again at a stipulated price* . . . shall maintain a record-keeping system . . . in which shall be entered in English, at the time he receives any article of personal property by way of pledge, pawn or *purchase*, a description of such article" [emphasis added]); General Statutes (Rev. to 1999) § 21-42 ("[e]ach such pawnbroker shall, at the time of making any loan on a pawn or pledge of personal property or of *purchasing such property on condition of selling the same back again at a stipulated price* . . . deliver to the person who pawns, pledges or *sells* such property . . . a memorandum or note containing the entry required to be made . . . by the provisions of section 21-41" [emphasis added]); General Statutes (Rev. to 1999) § 21-47 (b) ("[a]ny person [or entity] which wilfully violates any of the provisions of this chapter . . . or receives an article of personal property by way of pawn, pledge or *purchase* from any minor . . . shall be guilty of a class A misdemeanor" [emphasis added]).

[12] See General Statutes (Supp. 2012) § 21-40 (c) ("the applicant [for a pawnbroker license or the renewal thereof] shall disclose to the licensing

authority all places used or intended to be used by the business for the purchase, receipt, storage or *sale* of property" [emphasis added]); General Statutes (Supp. 2012) § 21-41 (a) ("[n]o pawnbroker shall enter into any *pledge* or *purchase transaction* with a minor unless such minor is accompanied by such minor's parent or guardian" [emphasis added]); General Statutes (Supp. 2012) § 21-45 ("[n]o pawnbroker shall sell or dispose of any personal property left with such pawnbroker *in deposit or pledge for money loaned* or *as a result of the purchase of such property on condition of selling the same back again at a stipulated price* in less than sixty days from the date when the same is left *in deposit or pledge* or *purchased on condition of selling the same back again at a stipulated price*, except when such sale or disposition is to the person who *deposited, pledged* or *sold* such property" [emphasis added]); General Statutes (Supp. 2012) § 21-46a ("[i]f the person who *deposited, pledged* or *sold* any property received by a pawnbroker or dealer is convicted of any offense arising out of such pawnbroker's . . . acquisition, retention or disposition of the property and such pawnbroker . . . suffered an economic loss . . . the court . . . may order restitution to such pawnbroker" [emphasis added]).

Although the legislature deleted some repurchase agreement language from General Statutes (Rev. to 2011) §§ 21-39 and 21-40 in 2011; see P.A. 11-100, §§ 2 and 3; it also concurrently deleted references to loans in those provisions. In addition, the legislature added a new definitional statute; see P.A. 11-100, § 1; which defines a "pawnbroker" as "a person who is engaged in the business of loaning money on the deposit or pledge of wearing apparel, jewelry, ornaments, household goods or other personal property or purchasing such property on condition of selling the same back again at a stipulated price," or, in other words, a person who is in the business of loaning money and entering into repurchase agreements. General Statutes § 21-39a (1). Thus, the phrase "business of a pawnbroker" in the current revision of § 21-39 incorporates by reference both types of transactions. Similarly, the current revision of § 21-40 (a) includes "suitable persons to be pawnbrokers," and, thus, in light of the definition of "pawnbroker" in § 21-39a (1), the inclusion of additional language in § 21-40 (a) regarding lending money or entering into repurchase agreements would have been redundant.

[13] The legislature's express inclusion of repurchase agreement language in § 21-45, as well as its removal of the phrase "directly and indirectly" from the pre-1997 version of § 21-44, is strong evidence that the scope of the two statutes is different. In 2011, the legislature amended General Statutes (Rev. to 2011) § 21-45 to provide: "No pawnbroker shall sell or dispose of any personal property left with such pawnbroker in deposit or pledge for money loaned or *as a result of the purchase of such property on condition of selling the same back again at a stipulated price* in less than sixty days from the date when the same is left in deposit or pledge or *purchased on condition of selling the same back again at a stipulated price*, except when such sale or disposition is to the person who deposited, pledged or *sold* such property . . . ." (Emphasis added.) P.A. 11-100, § 7, codified at General Statutes (Supp. 2012) § 21-45. The court in *Rhodes* considered the pre-1997 versions of §§ 21-44 and 21-45 together; see *Rhodes* v. *Hartford*, supra, 201 Conn. 93–102; and, therefore, if the legislature had not amended § 21-45, we might have determined that § 21-45 applied only to loans, as well.

We finally observe that, although the last sentence of § 21-45 appears to suggest that "deposit or pledge" includes repurchase agreements, both the language of § 21-45 and the statutory scheme as a whole strongly suggest that the inclusion of "repurchase" in the last sentence is a drafting error. The last sentence of § 21-45, which governs the transfer of title from the original property owner to the pawnbroker in the event that the original property owner fails to redeem the property, provides: "Upon the expiration of sixty days from the date when such property is left with a pawnbroker, if the person who *deposited or pledged* such property fails to redeem any such property in accordance with the terms of the transaction, such right of redemption *or repurchase* on the part of the person who deposited or pledged such property shall be extinguished and the pawnbroker shall acquire the entire interest in the property that was held by the person who deposited or pledged such property prior to such deposit or pledge without further notice to such person." (Emphasis added.) Because a repurchase transaction involves the transfer of title, the pawnbroker acquires the "entire interest" in the property when the transaction occurs rather than upon the customer's failure to redeem the property. Thus, practically speaking, the last sentence of § 21-45 would never apply to repurchase agreements because title already would have transferred by the time this provision applied.

[14] At its core, a loan is "a grant of something for temporary use . . . ." Black's Law Dictionary (9th Ed. 2009) p. 1019. With respect to a loan secured by collateral, or a secured loan, the loan "is secured by property or securi-

ties." Id., p. 1021. A "repurchase agreement" is a type of secured loan, that is, "[a] short term loan agreement by which one party sells a security [or property] to another party but promises to buy back the security [or property] on a specified date at a specified price." Id., p. 1419.

[15] We observe that the definition of "pawnbroker" in § 21-39a (1) is not incorporated by reference into the rest of the statutory scheme. Section 21-39a (1) defines "pawnbroker" as "a person who is engaged in the business of loaning money on the deposit or pledge of wearing apparel, jewelry, ornaments, household goods or other personal property or purchasing such property on condition of selling the same back again at a stipulated price . . . ." The word "pawnbroker," however, consistently is modified through-out the statutory scheme by references to loans, repurchase agreements, or both. Accordingly, incorporating the definition of "pawnbroker" by reference would render all subsequent references to loans and repurchase agreements superfluous. It is well established that "statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant, and that every sentence, phrase and clause is presumed to have a purpose." *Hopkins* v. *Pac*, supra, 180 Conn. 476. Thus, we determine that the definition of pawnbroker in § 21-39a does not incorporate automatically both types of transactions but, rather, that the inclusion of these transactions is set forth in the statute either by explicit reference or, as in § 21-39, by reference to the "business of a pawnbroker . . . ."

[16] General Statutes § 37-4 provides in relevant part: "No person . . . other than a pawnbroker as provided in section 21-44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum."

[17] The defendants also contend that we should not address this issue because it is unnecessary to do so as it does not relate to any of the plaintiff's pending claims. General Statutes § 51-199b (d) provides in relevant part that this court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Because the applicability of § 37-4 may be determinative of an issue before the District Court, we address the third certified question.

[18] We note that repurchase agreements are not unique to the pawnbroker context. For example, an individual might sell his watch to a neighbor for $100 with an option to repurchase the watch in thirty days for $200.

[19] As we explained in part I of this opinion, although the legislature's 1997 amendments to the pawnbroker statutes rendered this court's reasoning in *Rhodes* no longer applicable to that scheme, we agree with *Rhodes* that a repurchase agreement can be considered a type of indirect loan transaction.

[20] The precursor to § 37-4 was enacted in 1907. See Public Acts 1907, c. 238, § 1 ("[n]o person, firm, or corporation, or any agent thereof, other than a national bank or a bank or trust company duly incorporated under the laws of this state or a pawnbroker as provided in chapter 235 of the public acts of 1905, shall directly or indirectly loan money to any person and directly or indirectly charge, demand, accept, or make an agreement to receive therefor, interest at a greater rate than fifteen per centum per annum"). At that time, the precursor to § 21-44 provided in relevant part: "Pawnbrokers and loan brokers, and all persons who loan money on the pledge of personal property, are prohibited from taking or receiving directly or *indirectly*, for the use of money loaned on personal property, any more than the . . . rates [set forth in the statute] . . . ." (Emphasis added.) Public Acts 1905, c. 235, § 7.

[21] As we previously noted, the usury statute that was the precursor to § 37-4 was enacted in 1907, and the 1907 provision contained an exception for pawnbrokers. See Public Acts 1907, c. 238, § 1. That exception appeared to be applicable to the entire pawnbroker statutory scheme. See Public Acts 1907, c. 238, § 1 ("[n]o person, firm, or corporation . . . *other than* a national bank or a bank or trust company duly incorporated under the laws of this state or *a pawnbroker as provided in chapter 235 of the public acts of 1905*, shall directly or indirectly loan money to any person and directly or indirectly charge, demand, accept, or make an agreement to receive therefor, interest at a greater rate than fifteen per centum per annum" [emphasis added]). Chapter 235 of the 1905 Public Acts contained the eight provisions that comprised the entire pawnbroker statutory scheme. See generally Public Acts 1905, c. 235, §§ 1 through 8. The 1918 revision of the usury statute, however, restricted the pawnbroker exception to the provision in the pawn-

broker statutory scheme governing interest rates. See General Statutes (1918 Rev.) § 4798 ("[n]o person and no firm or corporation . . . *other than a pawnbroker as provided in section 3011*, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive, therefor, interest at a rate greater than twelve per centum per annum" [emphasis added]). General Statutes (1918 Rev.) § 3011 was a precursor to § 21-44 and governed rates of interest that pawnbrokers could take or receive, "directly or indirectly, for the use of money loaned on personal property . . . ."

[22] The dissenting justice concludes that pawnbrokers are excluded as a class from § 37-4 because General Statutes § 37-9 enumerates the types of transactions that are exempt from § 37-4, whereas § 37-4 enumerates the classes of individuals who are subject to its provisions. We disagree. Although § 37-9 does enumerate exceptions to § 37-4, these exceptions are not all based on the category of the transaction alone. For instance, § 37-9 provides in relevant part: "The provisions of sections 37-4, 37-5 and 37-6 shall not affect . . . (2) any loan *made by* (A) any bank, as defined in section 36a-2, or any out-of-state bank, as defined in section 36a-2, that maintains in this state a branch, as defined in section 36a-410, (B) any wholly-owned subsidiary of such bank or out-of-state bank, except a loan for consumer purposes, or (C) any Connecticut credit union, as defined in section 36a-2, or federal credit union, as defined in section 36a-2 . . . ." (Emphasis added.) This provision is thus dependent on two considerations: (1) whether the transaction is a loan; and (2) *whether the lender falls within one of the classes of entities set forth in subparagraphs (A), (B) or (C).* The class of lender also is an important factor in § 37-9 (5), (6) and (8). Accordingly, we are not persuaded that the fact that pawnbrokers are not referenced in § 37-9 means that they are excluded from the usury statute as a class. Instead, we conclude that the exclusion with respect to § 21-44 was set forth in § 37-4, rather than § 37-9, for another reason. As we explained previously in this opinion, the exclusion with respect to § 21-44 set forth in § 37-4 establishes the elastic scope of the two statutes to ensure that borrowers are protected from unreasonable interest rates, regardless of the source of the transaction.

The dissenting justice also cites *State* v. *Hurlburt*, 82 Conn. 232, 233, 72 A. 1079 (1909), in support of the proposition that pawnbrokers as a class are excluded from § 37-4. When *Hurlburt* was decided, however, the usury statute referred to the entire pawnbroker statutory scheme, rather than just the pawnbroker interest rate statute. See footnote 21 of this opinion. It thus makes sense that the court in *Hurlburt* would have concluded that pawnbrokers were excluded as a class. Because the legislature subsequently amended the pawnbroker exception and altered the scope of § 21-44, the scope of § 37-4 necessarily has changed, as well.